# EXHIBIT A-2

# EXHIBIT A-2

COPY

BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. RICKERT (190634)
rickert@whafh.com
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 2770
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

MARK C. RIFKIN
rifkin@whafh.com
JANINE POLLACK
pollack@whafh.com
RANDALL S. NEWMAN (190547)
newman@whafh.com
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
270 Madison Avenue
New York, New York 10016
Telephone: 212/545-4600
Facsimile: 212/545-4653

*Attorneys for Plaintiff George Loya*

[Additional Counsel Appear on Signature Page]

F I L E D
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

NOV 0 1 2016

E. Rodriguez

BY FAX

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF RIVERSIDE

| | |
|---|---|
| GEORGE LOYA, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WESTERN RIVERSIDE COUNCIL OF GOVERNMENTS and RENOVATE AMERICA, INC.,<br><br>Defendants. | Case No. **RIC '1614434**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

**EXHIBIT A-2  -8-**

Plaintiff, George Loya ("Loya"), on behalf of himself and all others similarly situated, by his undersigned attorneys, as his Complaint against Defendants Western Riverside Council of Governments ("WRCOG") and Renovate America, Inc. ("Renovate America") for: (1) violation of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq*. ("TILA"); (2) violation of the Home Ownership Equity Protection Act (15 U.S.C. § 1639) ("HOEPA"); (3) conspiracy to violate TILA and HOEPA; (4) violation of the California Covered Loan Law, California Financial Code § 4970, *et seq.*; and (5) violation of California Business and Professions Code § 17200, *et seq.*, hereby alleges as follows:

## INTRODUCTORY STATEMENT

1.     Plaintiff brings this action individually and on behalf of a class comprised of all persons who signed a contract with WRCOG for a HERO Loan on their principal dwelling and a subclass of all members of the class in which the disclosed administrative fee in the WRCOG Loan documents was equal to or exceeded 5.7% (the "Subclass") (collectively, the "Class"), against Defendants Renovate America and WRCOG seeking to redress these Defendants' pervasive pattern of false, deceptive, and otherwise unlawful practices regarding their origination and administration of purportedly "energy efficient" home improvement loans under their Home Energy Renovation Opportunity ("HERO") program, commonly called "HERO Loans."

2.     The HERO Loan program is comprised of an extremely complex series of transactions between, among others: (a) Defendant Renovate America; (b) Defendant WRCOG; (c) the Riverside County Tax Collector and various County Tax Collectors throughout California; (c) investors in securitized notes (the proceeds of which are used to fund the HERO Loans); and (d) ultimately the HERO Loan borrowers (Plaintiff and the Class herein).  The HERO Loan program was designed to give low and middle income homeowners, who potentially could not obtain conventional financing for traditional home improvement loans, the ability to make energy efficient home improvements through the HERO Loans.

3.     As more fully alleged herein, Defendant Renovate America created, designed, and implemented the HERO Loan program to lend money under California's Property Assessed Clean Energy or "PACE" financing program, to shift the burden of collecting payments on HERO Loans

- 1 -

---

CLASS ACTION COMPLAINT

to the county taxing authority, to shift the risk of default to purchasers of notes that are backed by securitized bonds used to finance the HERO Loans, and to obtain priority over any existing mortgage(s) on a borrower's property.

4.     As more fully alleged herein, Defendant Renovate America carries out the Hero Loan program by materially false and deceptive means, including: (a) imposing and collecting excessive and unlawful closing costs on borrowers; (b) secretly double-counting and collecting excessive and unlawful administrative fees on HERO Loans; (c) secretly imposing and collecting unlawful compound interest on HERO Loans; (d) imposing and collecting unlawful pre-payment penalties from HERO borrowers; and (e) not crediting installment payments on HERO Loans until long after borrowers make payments.  Plaintiff and the Class were victims of and damaged as a result of these unlawful, unfair and deceptive practices.

5.     Defendant Renovate America overcharges virtually every cost, fee, and amount due from borrowers in the HERO Loan program to maximize its own profits at the expense of HERO Loan borrowers, *i.e.*, Plaintiff and the other Class members.  Plaintiff asserts his claims against Renovate America for its participation in the HERO Loan program.

6.     Defendant WRCOG is, along with Renovate America, a necessary participant in the HERO Loan Program.  Plaintiff asserts his claims against WRCOG for its participation in the HERO Loan program.

## JURISDICTION AND VENUE

7.     This Court has personal jurisdiction over Defendants because they are doing business in the State of California within Riverside County.

8.     Venue is proper in this Court pursuant to California Code of Civil Procedure § 395 because the parties agreed to this Court's jurisdiction and venue to resolve disputes pursuant to the voluntary contractual assessment contract that Plaintiff and each Class member entered into with Defendant WRCOG.

## PARTIES

9.     Plaintiff, George Loya, is an individual residing at 22470 Climbing Rose Dr., Moreno Valley, California 92557 (the "Property").  Plaintiff owns the Property as his primary

- 2 -

CLASS ACTION COMPLAINT

**EXHIBIT A-2  -10-**

1    residence.

2         10.    Defendant WRCOG is a joint exercise of powers authority, the members of which

3    include in part, numerous cities in Riverside County and Riverside County itself.  WRCOG's

4    activities include regional review of environmentally significant projects, air quality planning,

5    regional housing needs assessment, hazardous and solid waste management, demographic

6    projections, growth management analysis and development of subregional strategies, review of

7    local general plan amendments, area wide water quality planning, transportation planning,

8    modeling and programming, and general planning support and technical assistance as directed by

9    member agencies.

10         11.    Defendant Renovate America is a Delaware corporation with a principal place of

11    business located at 15073 Avenue of Science, San Diego, California 92128.

12    **<u>FACTUAL ALLEGATIONS</u>**

13    ***<u>California's PACE Program</u>***

14         12.    Chapter 29 of Part 3 of Division 7 of the Streets and Highways Code of the State of

15    California ("Chapter 29") authorizes a legislative body, such as Defendant WRCOG, to designate

16    an area within which authorized public officials and property owners may enter into voluntary

17    contractual assessments to finance the installation of renewable, energy efficient improvements or

18    water conservation improvements that are permanently fixed to real property.

19         13.    The financing for Chapter 29 home improvements is commonly known as Property

20    Assessed Clean Energy or "PACE" financing, and the home improvement loan is commonly

21    known as a "PACE Loan."

22         14.    Unlike a typical home improvement loan, a PACE Loan is created by a homeowner

23    signing a voluntary assessment contract with a public entity that allows the public entity to collect

24    payments on the PACE Loan through the county tax collector.

25         15.    The essential features of a PACE Loan are that: (1) the debt for the property

26    improvements attaches to the homeowner's property and is secured by a voluntary contractual

27    assessment recorded as a lien against the property; (2) the lien created by the PACE Loan has

28    priority over other debts on the property, including a homeowner's first mortgage; and (3) the

- 3 -

**EXHIBIT A-2  -11-**

1    repayment of the PACE Loan is collected by the county tax collector.

2        16.    The PACE Loan program has had a controversial history with mortgage industry

3    participants, such as the Federal National Mortgage Association ("Fannie Mae") and Federal

4    Home Loan Mortgage Corporation ("Freddie Mac"), concerned about local governments lending

5    money to homeowners who cannot obtain conventional financing for ordinary home equity loans,

6    especially when those loans are disguised as "tax liens" with priority over existing secured

7    mortgage(s).

8        17.    On July 6, 2010, the Federal Housing Finance Agency ("FHFA"), the independent

9    regulatory agency responsible for oversight of secondary mortgage markets including Fannie Mae

10   and Freddie Mac, issued a statement concerning PACE Loans which directed Fannie Mae, Freddie

11   Mac, and the twelve Federal Home Loan Banks (the "FHL Banks") to take certain actions to limit

12   their exposure to financial risks associated with first-lien PACE Loans.

13       18.    In a directive issued on February 28, 2011, FHFA expressly directed Fannie Mae,

14   Freddie Mac, and the FHL Banks not to purchase mortgages affected by voluntary contractual

15   assessments such as PACE Loans.

16       19.    On December 22, 2014, FHFA released the following Statement of the Federal

17   Housing Agency on Certain Super-Priority Liens:

18

19   Energy Retrofit Financing Programs Structured as Tax Assessments

20   While FHFA fully supports energy retrofit financing programs to allow
     homeowners to improve energy efficiency, these programs must be structured to

21   ensure protection of the core financing for the home and, therefore, cannot
     undermine the first-lien status of Fannie Mae and Freddie Mac mortgages. Some

22   entities and localities are advancing the argument that single-family energy retrofit
     financing programs that are structured to make *loans* through the homeowner's

23   property tax assessment and require that borrowers repay their *loans* as part of their
     property tax bill should have priority over all other *loans*, including pre-existing

24   Fannie Mae and Freddie Mac mortgages. One such program is known as the
     Property Assessed Clean Energy (PACE) program, which often provides *loans* as

25   first-liens and is offered in California and in some other states. Localities offering
     these ***PACE loans*** threaten to move existing Fannie Mae and Freddie Mac

26   mortgages to a second lien position and increase the risk of loss to the Enterprises
     [Fannie Mae and Freddie Mac] and by extension, to taxpayers.

27

28

                                        - 4 -

CLASS ACTION COMPLAINT                                  **EXHIBIT A-2  -12-**

In issuing this statement, FHFA wants to make clear to homeowners, lenders, other financial institutions, state officials, and the public that Fannie Mae and Freddie Mac's policies prohibit the purchase of a mortgage where the property has a first-lien *PACE loan* attached to it.  This restriction has two potential implications for borrowers.  First, a homeowner with a first-lien *PACE loan* cannot refinance their existing mortgage with a Fannie Mae or Freddie Mac mortgage.  Second, anyone wanting to buy a home that already has a first-lien *PACE loan* cannot use a Fannie Mae or Freddie Mac loan for the purchase.  These restrictions may reduce the marketability of the house or require the homeowner to pay off the *PACE loan* before selling the house.

FHFA believes it is important for states and municipalities to understand these restrictions before continuing to offer the programs.  Additionally, FHFA believes that borrowers should fully understand these restrictions prior to taking out a first-lien *PACE loan*.

(Emphasis added).

20.     Despite FHFA's statements regarding PACE loans, Renovate America's website contains the following statement to potential consumers interested in a PACE Loan: "[I]f the property is sold, any remaining balance may be legally passed on to the new owner." However, Fannie Mae, Freddie Mac, the Federal Housing Administration ("FHA"), and the Veterans Administration ("VA") will not purchase mortgages on any property encumbered with an existing PACE Loan.

***Intended Purpose of PACE Loans and DOE Guidelines***

21.     In May 2010, the United States Department of Energy ("DOE") issued Guidelines for Pilot PACE Financing Programs (the "Guidelines"), in which the DOE announced best practice guidelines to help implement the PACE programs.

22.     According to the Guidelines, the cost of PACE program home improvements are expected to pay for themselves over the life of a PACE Loan.  In other words, the PACE program must be designed so that a homeowner's energy savings should be more than the total amount of the payments due on the PACE Loan over the life of the loan.  The Guidelines provide that PACE lenders only approve PACE Loans for homeowners who are expected to achieve those net savings.

23.     The Guidelines also direct that first mortgage holders receive a notice when liens to secure PACE Loans are placed on property secured by a first mortgage. Since most homeowners

- 5 -

who obtain a PACE Loan to finance home improvements escrow their taxes with their first mortgage lenders, if a mortgage holder is unaware of a PACE lien, the homeowner's escrow balance will be insufficient when a PACE Loan payment is due, requiring the homeowner to pay the full amount of the PACE Loan payment to the mortgage holder to make up for the shortfall in his or her escrow account.

24.     Finally, the Guidelines direct PACE lenders to consider a homeowner's ability to repay a PACE Loan and not merely rely upon the homeowner's equity in his or her property when approving a PACE loan.

25.     As alleged more fully below, Defendants have failed to adhere to the DOE's Guidelines.

***Renovate America's HERO Loan Program***

26.     Defendant Renovate America was formed in 2008 to work with local governments to implement residential PACE programs.  The Chief Executive Officer of Renovate America is John Paul McNeill, a certified public accountant, its Chief Operating Officer is Nick Fergus, a computer scientist, and its Chief Financial Officer is Tom Hemmings, also a certified public accountant.

27.     Defendant Renovate America's PACE program is known as the Home Energy Renovation Opportunity program, commonly known as the "HERO Program." Home improvement loans under the HERO program are commonly known as "HERO Loans."

28.     When Defendant Renovate America creates and implements a HERO Program with a local government partner, it is hired to market, originate and administer HERO Loans. According to its website, Defendant Renovate America offers HERO Loans in at least 48 counties in the State of California, including Riverside County.

29.     Property owners seeking to participate in the HERO Program are identified, selected, and pre-approved by Renovate America and then enter into a home improvement contract with a contractor and have the improvements completed before the financing is put in place and before any lien is recorded against the property.

30.     To participate in the HERO Program, a property owner must meet the following

- 6 -

**EXHIBIT A-2  -14-**

three qualifications:

    a.    mortgage related debt on the property must not exceed 90% of the value of the property;

    b.    the property owner must be current on his or her property taxes and there must be no more than one late payment in the past three years; and

    c.    the property owner must be current on all property debt at the time of the application and cannot have had more than one 30-day mortgage late payment over the previous 12 months.

31.    In addition, to qualify for the HERO Program, the proposed project must meet the following two requirements:

    a.    the amount to be financed under the program may not exceed 15% of the value of the property; and

    b.    the combined amount to be financed under the program plus the mortgage-related debt must not exceed 100% of the value of the property.

32.    Defendant Renovate America determines the value of a property using an automated valuation model ("AVM"), provided by a purportedly independent third-party vendor. If an AVM value is not available for a particular property, Defendant Renovate America uses the assessed value of the property instead.

33.    Defendant Renovate America does not perform the home improvements it finances. Instead, Renovate America uses thousands of local contractors participating in the Hero Loan Program to perform the home improvements.

34.    Defendant Renovate America enters into a Registered Contractor Participation Agreement with each and every contractor that participates in the Hero Loan Program. That agreement requires participating contractors to "[c]omply with all local, state and federal marketing and telemarketing laws, regulations and rules, including but not limited to the Telephone Consumer Protection Act and the ***Truth in Lending Act***." (Emphasis added).

35.    Defendant Renovate America provides participating contractors with marketing materials as well as information about the value of a potential customer's home.

36.    Therefore, a door-to-door salesman (or contractor) trying to induce a homeowner

- 7 -

CLASS ACTION COMPLAINT

1   into entering into a HERO Loan will know before even approaching a homeowner approximately

2   how much the homeowner can borrow through the HERO Program.

3       37.    With this information in hand, a door-to-door salesman (or contractor) seeking to

4   induce a homeowner into entering into a HERO Loan typically gives a homeowner an inflated

5   quote on the home improvement work that purportedly will reduce his or her energy costs so that

6   the amount quoted comes fairly close to the maximum amount the salesman knows the

7   homeowner will be able to borrower under the HERO Program.

8       38.    Defendant Renovate America's marketing materials include "Contractor Talking

9   Points," which advise contractors that they may inform prospective HERO Loan borrowers that

10  they will "be able to transfer any remaining balance" on a HERO Loan to the new owners if they

11  sell their homes.  However, as alleged above, Fannie Mae, Freddie Mac, FHA, and the VA will

12  not purchase mortgages on any property encumbered with an existing PACE Loan.

13  ***Renovate America and WRCOGWRCOG's Involvement in the PACE Program***

14      39.    On or about January 12, 2011, Defendant WRCOG agreed with Defendant

15  Renovate America that Renovate America would implement the PACE Program in Riverside

16  County (the "WRCOG HERO Program").

17      40.    Defendant Renovate America agreed with Defendant WRCOG that WRCOG

18  would raise funds for the WRCOG HERO Program exclusively through the sale of improvement

19  bonds.

20      41.    Defendant Renovate America agreed to provide services for the WRCOG HERO

21  Program, including, but not limited to: reviewing and editing all polices for the HERO Program;

22  providing documentation required for registering HERO contractors; accepting, processing and

23  approving borrowers' HERO Loan applications; approving proposed HERO improvements;

24  providing  HERO financing disclosures; accepting, processing and approving HERO funding

25  requests;  issuing and executing contractual assessment agreements; recording lien documents;

26  issuing payments to contractors; creating all forms needed for the WRCOG HERO Program;

27  designing and building the WRCOG HERO Program website; pulling all credit, title, valuation

28  and other reports; reviewing the eligibility of borrowers' properties; and providing notifications of

- 8 -

EXHIBIT A-2  -16-

approval, denial or incomplete status of borrowers' HERO applications.

42.    Defendant Renovate America also agreed to work with WRCOG and its member jurisdictions to promote the WRCOG HERO Program.

43.    Defendant Renovate America further agreed to work with WRCOG to develop a standard set of documents suitable to the parties for use in the WRCOG HERO Program.

44.    In addition, Defendant Renovate America further agreed to work with Defendant WRCOG and the County of Riverside to ensure that the HERO assessments are placed on the appropriate property owner's property tax bill.

45.    WRCOG announced its WRCOG HERO Program and began taking applications to participate in the WRCOG HERO Program in December 2011.

46.    In or about June 2013, WRCOG launched what is known as the "California HERO Program" throughout California.  The California HERO Program allows cities and counties in California that are not located in Riverside County to become associate members of WRCOG thereby allowing residents in those jurisdictions to participate in the California HERO Program. The California HERO Program is administered by Defendant WRCOG and Defendant Renovate America.

47.    WRCOG and Renovate America agreed that Renovate America would provide the services alleged above for the California HERO Program throughout California (the WRCOG HERO Program and the California HERO Program are collectively referred to as the "HERO Program").

48.    As alleged above, Defendant WRCOG has no funds to finance the HERO Loans to property owners.  Thus, to fund the HERO Loans, WRCOG issues improvement bonds under the Improvement Bond Act of 1915 (California Streets and Highways Code §§ 8500, *et seq*.) (the "PACE Bonds").  Pursuant to a Bond Purchase Agreement between Defendants WRCOG and Renovate America, Renovate America is required to buy all the PACE Bonds issued by WRCOG for a purchase price equal to the outstanding principal amount of the bond plus accrued interest.

49.    The PACE Bonds are secured by the liens created as a result of the HERO Loans on real property owned by the HERO Loan participants.

CLASS ACTION COMPLAINT

50.    Defendant Renovate America's PACE Bond portfolio is pooled and asset-backed notes are issued and sold to investors to finance the bonds purchased by Renovate America.

51.    To date, Defendant Renovate America has originated over 100,000 HERO Loans, representing more than $2 billion in funding for residential property owners in California.

52.    Unlike the subprime mortgage crisis that almost caused the collapse of the U.S. economy in 2007, the PACE Bonds are practically risk-free because the bonds are secured by the unpaid contractual assessments and have first-lien status over each borrower's pre-existing mortgage(s).

53.    At all times relevant hereto, Defendant Renovate America has charged each HERO Loan participant an administrative fee of between five and more than seven percent of the stated amount of his or her HERO Loan, a portion of which is then shared by both Defendants.

54.    In fact, according to Defendant WRCOG's fiscal year 2015-2016 annual budget, WRCOG collected approximately $1.5 million in revenue from its WRCOG HERO Program and approximately $6 million in revenue from in California HERO Program.

### *Facts Related to Plaintiff's HERO Loan Transaction with Defendants*

55.    In June 2014, a salesman/contractor made a visit to Plaintiff's primary residence to discuss replacing the windows on Plaintiff's Property.

56.    The salesman/contractor told Plaintiff that he could obtain financing for the work through Defendants' HERO Loan Program.

57.    The salesman/contractor told Plaintiff that the cost of the new windows would be $13,566.00.

58.    Plaintiff completed and executed the HERO Loan application on June 26, 2014.

59.    Plaintiff also executed a HERO Program assessment contract on June 26, 2014 (the "Assessment Contract").

60.    Section 4 of the Assessment Contract stated that the assessment plus interest, the additional administrative assessment, and any penalties incurred as a result of any delinquency in the payment of any installment of the assessment "shall constitute a lien" on Plaintiff's Property.

61.    According to Section 9 of the Assessment Contract, Plaintiff purportedly waived

- 10 -

**EXHIBIT A-2  -18-**

the right to sue Defendants for any claims arising out of the Assessment Contract.

62. Attached as Exhibit B to the Assessment Contract is a "List of Contract Documents, Disbursement, and Schedule of Annual Assessment Installments, Including Principal, Interest and Annual Assessment Administrative Fee."

63. According to Exhibit B to the Assessment Contract, the maximum disbursement amount was $16,532.75 and the estimated disbursement date was to be no later than October 13, 2014.

64. Exhibit B to Plaintiff's Assessment Contract also stated as follows: "Interest totaling a maximum of $1,687.72 will accumulate until your first Payment. That amount will be added to Owner's Maximum Disbursement Amount."

65. Exhibit B to Plaintiff's Assessment Contract stated that the "Assessment Interest Rate is 8.75%."

66. Exhibit B to Plaintiff's Assessment Contract stated that:

> The Annual Percentage Rate (APR) of your assessment is 10.80%. APR is the Effective Cost of Credit in **consumer loans** and real estate loans expressed as a percentage interest rate. The annual percentage rate is the interest rate the borrower actually pays, including fees required in order to participate in the program.

(Emphasis added).

67. Exhibit B to Plaintiff's Assessment Contract estimated that "[t]he total administrative fees, recording fees and annual assessment added to your assessment is $1,279.03."

68. Exhibit B of Plaintiff's Assessment Contract contains the following paragraph:

**Prepayment**

> You have the right to pay off your assessment lien amount in full, or in part in increments of $5,000 at any time pursuant to Section 3(c) of the Assessment Contract. However, if you do so, you will have to pay (i) the principal amount of the assessment to be prepaid (the "Assessment Prepayment Amount"), (ii) **a prepayment premium if you prepay within the first five years from the Effective Date (if you prepay after the first five years, there is no prepayment premium)**, see table below, (iii) interest on the Assessment Prepayment Amount to the earlier of March 2 or September 2 occurring at least 90 days following the date of the prepayment is made, and (vi) a processing fee (not to exceed $500).

- 11 -

EXHIBIT A-2  -19-

(Emphasis added).

69.   The prepayment premium contained in Exhibit B of the Assessment Contract states that the prepayment premium "shall be a percentage of the principal amount of the Assessment" with the premium being 5% in the first year, 4% in the second year and 3% in the third, fourth and fifth years. In addition to the prepayment premium discussed above, Exhibit B to Plaintiff's Assessment Contract required Plaintiff to pay interest on the Assessment Prepayment Amount "to the earlier of March 2 or September 2 occurring at least 90 days following the date the prepayment is made."

70.   WRCOG countersigned the Assessment contract on June 27, 2014.

71.   Subsequent to the execution of the Assessment Contract, Plaintiff and the contractor executed a Completion Certificate.  The fully executed Completion Certificate was returned to Defendants shortly thereafter.

72.   On information and belief, Defendants paid the sum of $16,560.00 directly to Plaintiff's contractor after receiving the fully executed Completion Certificate.

73.   On July 29, 2014, Defendants recorded a Notice of Assessment dated June 26, 2014 with the Riverside County Recorder's Office (the "Recorded Notice of Assessment").

74.   The Recorded Notice of Assessment for Plaintiff's HERO Loan was in the principal amount of $16,359.95.  Defendants never provided any information as to how the principal amount of Plaintiff's HERO Loan was calculated.

75.   Page 2 of the Recorded Notice of Assessment states that:

NOTICE IS FURTHER GIVEN that upon the recording of this notice in the office of the County Recorder, the Assessment shall become a lien upon the Property.  In addition, the Annual Administrative Assessment shall become a lien upon the Property at the same time as property taxes upon the Property become a lien each year.

***Payments Pursuant to the HERO Assessment***

76.   In California, property taxes are collected by the various counties although they are governed by California State law.  In order to determine the amount of a homeowner's property taxes, the county assessor must first assess the value of the property.  Generally, the assessed value

- 12 -

is the market value at the time of purchase.  Pursuant to Proposition 13, a law approved by California voters in 1978, the value of a property cannot increase by more than 2% per year unless the property is sold or any new construction is completed, at which time the property must be reassessed.

77.    After the assessor has determined the property's value, the auditor-controller applies the appropriate tax rates, which include the general tax levy, locally voted special taxes, and any city or district assessments.  The general tax levy is determined in accordance with State law and is limited to $1 per $100 of the assessed value of the property pursuant to Proposition 13.  Special taxes and district assessments are passed by vote.  The county tax collector prepares property tax bills based on the Auditor-Controller's tax calculations, distributes the tax bills and collects the taxes.

78.    Property taxes are payable in two installments for a fiscal year that begins on July 1 and ends on June 30.  The first installment is due on November 1 (and must be paid on or before December 10 without incurring a 10% penalty); the second installment is due on February 1 (and must be paid on or before April 10 without incurring a 10% penalty).  Thus, for example, in the 2015-2016 Fiscal Tax Year, the first installment was due on November 1, 2015 and the second installment was due on March 1, 2016.

79.    Plaintiff's first mortgage lender, Wells Fargo, made the first half of the annual HERO Loan payment in November 2015, through the escrow account Wells Fargo maintained on his behalf.

80.    Plaintiff's first mortgage lender, Wells Fargo, made the second half of the annual HERO Loan payment in March 2016, through the escrow account Wells Fargo maintained on his behalf.

***Plaintiff Paid Off His HERO Loan***

81.    In 2016, Plaintiff decided to refinance his mortgage with Wells Fargo.  However, in order to refinance his mortgage, Wells Fargo insisted that a portion of the loan proceeds from the refinance transaction be used to pay off Plaintiff's Hero Loan.

82.    Thereafter, Defendants provided Plaintiff with a "HERO Program Payoff

- 13 -

CLASS ACTION COMPLAINT

Statement" dated April 26, 2016 (the "HERO Payoff").  Upon information and belief, the HERO Payoff was prepared by Renovate America.

83.    According to the HERO Payoff, the total payoff amount needed to satisfy Plaintiff's HERO Loan was $15,565.05 broken down as follows:

| Description of Payment | |
|---|---|
| Project Cost (labor and products) 8/8/2014 | $13,566.00 |
| HERO Administrative program cost | $1,137.02 |
| County recording and processing fee | $225.43 |
| Interest from 9/2/2014 to 7/5/2016 | $2,636.34 |
| Assessment payments via property tax bill from 7/1/2015 to 6/30/2015 | $(1,999.74) |
| **TOTAL PAYOFF AMOUNT DUE:** | **$15,565.05** |

84.    According to the HERO Payoff, WRCOG issued Bond Series 150406-BE-R-03-15 to finance the cost of his improvements.

85.    Plaintiff paid $15,565.05 to satisfy his HERO Loan after receiving the HERO Payoff.

86.    As part of paying off Plaintiff's HERO Loan, Defendants required Plaintiff to pay interest from the date he paid off the HERO Loan to July 5, 2016 even though Plaintiff had paid the principal amount of his HERO Loan prior to July 5, 2016.

**_Secret Double-Counting of Accrued Interest_**

87.    In the HERO loan application, Defendant Renovate America tells each HERO Loan borrower that interest will be computed **_from the closing date of the loan_** until the date of the borrower's first loan payment, and that accrued interest computed in that manner will be added to the stated amount of the HERO Loan.  In the HERO loan application, Defendants do not tell HERO Loan borrowers that they will be charged interest twice for that specified period of time.

88.    In his HERO loan application, Plaintiff was told by Defendant Renovate America that accrued interest would be computed from the closing date of his HERO Loan until his first loan payment date, but was not told that he would be charged interest twice for that period of time.

89.    In the Assessment Contract, however, Defendants identify a **_different_** period of

- 14 -

**EXHIBIT A-2  -22-**

time for computing accrued interest.  In the Assessment Contract, Defendants tell each HERO Loan borrower that interest will be computed *from the date on which Defendant WRCOG issues bonds to finance the work* until the date of the borrower's first loan payment, and that accrued interest computed in that second manner will be added to the stated amount of the HERO Loan.  In the Assessment Contract, Defendants do not tell HERO Loan borrowers that they will be charged interest twice for that other specified period of time.

90.    In his Assessment Contract, Plaintiff was told by Defendants that accrued interest would be computed from the date on which WRCOG issued bonds to finance his work until his first loan payment date, but he was not told that he would be charged interest twice for that period of time.

91.    Upon information and belief, prior to 2015, Defendants did not state in the financing summary how accrued interest would be calculated.  Beginning in or about October 2015, however, in the financing summary, Defendants have identified a *third* period of time for computing accrued interest.  Since in or about October 2015, in the financing summary Defendants have told each HERO Loan borrower that interest will be computed *from the date on which the work is completed* until the date of the borrower's first loan payment, and that accrued interest computed in that third manner would be added to the stated amount of the HERO Loan.  In the financing summary, Defendants do not tell HERO Loan borrowers they will be charged interest twice for that third specified period of time.

92.    In the financing summary given to Plaintiff, Defendants did not state how or when accrued interest would be calculated before Plaintiff's first HERO Loan payment was due and Plaintiff was not told that he would be charged twice for any accrued interest.

93.    Defendants never told HERO Loan borrowers, and HERO Loan borrowers did not agree, that interest would be charged for a *second time* on the accrued interest added to the stated amount of the HERO Loan.

94.    In fact, Defendants secretly charge interest *twice* on the amount of accrued interest added to the stated amount of all the HERO Loans from whenever the accrued interest is calculated until the date of the borrower's first loan payment.  Defendants simply inflate the stated

- 15 -

1  amount of each HERO Loan by the amount of accrued interest, and then re-compute interest on

2  that inflated amount.

3      95.    The double-counted interest, which is **not** disclosed to HERO Loan borrowers

4  (Plaintiff and the Class members herein) or agreed to by them, is amortized over the entire life of

5  the loans and included (without any credit or setoff) in any pay-off amounts given to them.

6  ***Secret Double-Counting of Administration Fees***

7      96.    During the relevant time period, in the loan application, Defendants stated that they

8  would charge each HERO Loan borrower a "one-time administration fee" based upon the

9  "principal amount" of his or her HERO Loan, a portion of which is then shared by the Defendants.

10  During the relevant time period, the amount of the administration fee ranged from a low of 4.99%

11  to a high of 6.95%.

12      97.    Defendants do not define the term "principal amount" in any of the HERO Loan

13  Program documents.  In the documents, Defendants variously use the terms "principal amount,"

14  "assessment," "assessment amount," and "assessment lien amount" without defining any of those

15  terms, leaving the meaning of the terms unclear and confusing.

16      98.    In the HERO loan application given to Plaintiff, Defendants stated they would

17  charge him a one-time administration fee of 6.95% of the "principal amount" of his assessment.

18      99.    In fact, the actual administration fee charged and collected by Defendants is not

19  between 4.99% and 6.95% percent, but in fact is between 5.25% and 7.5%.  These higher numbers

20  are because Defendants charge and collect an administration fee **on the administration fee** as well

21  as on the principal amount of the HERO Loan, thus secretly double-counting the administration

22  fees they receive in the same way they secretly double-count interest.

23      100.    The formula used by Defendants to calculate the administration fee is not simply

24  the "principal amount" of the HERO Loan multiplied by the stated percentage of the

25  administration fee, as the HERO Loan documents imply.  Rather, the actual formula Defendants

26  use to calculate the administration fee is much more complicated: it is the sum of the project cost,

27  plus accrued interest, the annual assessment administration fee, and the recording fee, multiplied

28  by the reciprocal of one minus the stated percentage of the administration fee minus one.  That

- 16 -

CLASS ACTION COMPLAINT

**EXHIBIT A-2  -24-**

complicated formula, which yields a percentage administration fee significantly **higher** than the percentage stated in each HERO Loan borrower's loan application, is never disclosed to the HERO Loan borrowers (Plaintiff and the Class members).

101.    For Plaintiff, the actual formula Defendants used to calculate the administration fee is as follows:

$$\$15,222.93 \times (1/(1-0.0695)-1) = \$1,137.02$$

102.    Therefore, the actual administration fee charged to Plaintiff was 7.4691%, which is significantly higher than the 6.95% administration fee disclosed in Plaintiff's HERO Loan application.

### *Failure to Credit Payments When Made*

103.    Unbeknownst to Plaintiff and the other Class members, Defendants do not credit HERO Loan payments when they are made. Rather, Defendants credit payments only once every year, on July 1st of each year, the first day of the tax year in California.

104.    Despite the fact that Plaintiff made **two** timely semi-annual HERO Loan payments in November 2015, and March 2016, Defendants did not credit Plaintiff with **either** of the two payments when calculating his HERO Loan payoff amount, thereby secretly increasing the total amount of interest that Defendants collected from Plaintiff.

105.    Defendants likewise secretly increased the total amount of interest that they charge and collect from all other Class members.

### *Defendants Overcharged the Recording Fee*

106.    In the loan application, Defendants state that: "At the time of closing, WRCOG will pass-through the assessment recording fee of approximately $95 to you to cover the costs of recording the assessment. This fee will be added to the assessment amount."

107.    During the relevant time period, the cost to record a document such as a Payment of Contractual Assessment Required or a Notice of Assessment in Riverside County was $15 for the first page and $3 for each subsequent page.

108.    Upon information and belief, during the relevant time period herein, Defendants knew that the Payment of Contractual Assessment Required for each HERO Loan would consist

- 17 -

of approximately three pages and would cost approximately $21 to record ($15 first page + $6 for
2 additional pages = $21), and that the Notice of Assessment, if filed as a separate document,
would consist of approximately 14 pages and would cost approximately $54 to record ($15 first
page + $39 for 13 additional pages = $54).  Therefore, Defendants knew that the total "pass-
through" recording fees for each HERO Loan would be less than $95.

109.    Despite the fact that Defendants paid less than $95 in recording fees for each
HERO Loan, they capitalized the entire sum of $95 into the principal balance of each HERO Loan
borrower's HERO Loan.

110.    Defendants paid only $75 to record Plaintiff's Payment of Contractual Assessment
Required and Notice of Assessment, but charged Plaintiff $95 as the "pass-through" recording fee.

111.    In addition, Defendants computed accrued interest on the project cost plus the
inflated recording fee, and charged the administration fee at the undisclosed effective rate of
7.4691% (rather than the stated rate of 6.95%) on the project cost, plus the over-stated accrued
interest and the inflated recording fee.  Defendants then amortized interest on that entire overstated
amount for the 15-year duration of Plaintiff's HERO Loan.

112.    As a result of the foregoing, Defendants overcharged Plaintiff and each Class
member on accrued interest (which they secretly double-counted), on administration fees (which
they secretly double-counted), on recording fees (which they secretly inflated), and on amortized
interest for the duration of each borrower's HERO Loan.

***Understatement of Estimated APR***

113.    Throughout the relevant time period, Defendants never disclosed to Plaintiff or any
other Class member the actual annual percentage rate ("APR") for any borrower's HERO Loan.

114.    In the Assessment Contracts, Defendants merely estimate the APR for each HERO
Loan.

115.    On information and belief, during the relevant time period, Defendants improperly
calculated the estimated APR for each HERO Loan by failing to subtract administration fees,
recording fees, and the annual assessment fee from the APR calculation.

116.    The stated interest rate in Plaintiff's Assessment Contract was 8.75% and the

- 18 -

estimated APR for Plaintiff's HERO Loan disclosed in his Assessment Contract was 10.80%.

117.    When calculated properly, the APR for Plaintiff's HERO Loan, using the stated interest rate of 8.75%, the estimated assessment amount of $16,532.75, the estimated capitalized interest of $1,687.72, and the estimated administration, recording, and the annual assessment fee of $1,279.03, exceeds 11.5%.

## CLASS ACTION ALLEGATIONS

118.    Plaintiff brings this action pursuant to Code of Civil Procedure § 382 as a class action on behalf of himself and all others similarly situated for the purpose of asserting the claims alleged in this Complaint on a common basis.

119.    The Class is comprised of all persons or entities who signed a contract with Defendant WRCOG for a HERO Loan on their principal dwelling and the Subclass is comprised of all members of the Class who entered into a HERO Loan in which the disclosed administrative fee in the HERO Loan documents was equal to or exceeded 5.7% (the "Subclass") (collectively, the "Class").  Defendants and their directors, officers, employees, and affiliates are excluded from the Class.

120.    Although Plaintiff does not presently know the exact size of the Class or the names and addresses of all Class members, such information can be readily obtained from the books and records of Defendants.  Upon information and belief, over 90,000 HERO Loans were made to Class members that participated in WRCOG's HERO Program during the relevant time period. Thus, the proposed Class is so numerous that joinder of all members is impracticable.

121.    The claims of all member of the Class involve common question of law and fact including:

a.   whether Defendants violated TILA and/or HOEPA by failing to provide, or providing in an inappropriate manner, to Plaintiff and the Class members certain disclosures mandated under TILA and/or HOEPA;

b.   whether Defendants violated TILA and/or HOEPA by including terms in the HERO Loan documents provided to Plaintiff and the Class members that violate TILA and/or HOEPA;

- 19 -

EXHIBIT A-2  -27-

c.  whether Defendants steered Plaintiff and the Class members to HERO Loans that had predatory characteristics or effects or extended HERO Loans solely based on the amount of equity in their homes rather than on their ability to repay the HERO Loans;

d.  whether Defendants engaged in a conspiracy to violate TILA and/or HOEPA;

e.  whether Defendant Renovate America violated the Covered Loan Law with respect to the Subclass;

f.  whether Defendant Renovate America violated § 17200 by engaging in unlawful, unfair and/or deceptive activities with respect to the HERO Loans;

g.  whether Plaintiff and the Class members have sustained damages by reason of Defendants' wrongful conduct alleged herein and, if so, what measure of such damages is proper;

h.  whether Plaintiff and the Class members are entitled to injunctive relief by reason of Defendants' wrongful conduct.

122.  The common questions of law and fact predominate over any potential individual issues.

123.  Plaintiff's claims are typical of the claims of all other members of the Class. Plaintiff's interests do not conflict with the interests of any other member of the Class, in that Plaintiff and the other members of the Class were subjected to the same unlawful conduct.

124.  Plaintiff is committed to the vigorous prosecution of this action and has retained competent legal counsel experienced in class action and complex litigation.

125.  Plaintiff is an adequate representative of the Class and, together with his attorneys, is able to and will fairly and adequately protect the interests of the Class and its members.

126.  A class action is superior to other available methods for the fair, just, and efficient adjudication of the claims asserted herein.  Joinder of all members of the Class is impracticable and, for financial and other reasons, it would be impractical for individual members of the Class to pursue separate claims.

127.  Moreover, the prosecution of separate actions by individual members of the Class

- 20 -

**EXHIBIT A-2  -28-**

would create the risk of varying and inconsistent adjudications, and would unduly burden the courts.

128.    Plaintiff anticipates no difficulty in the management of this litigation as a class action.

**FIRST CAUSE OF ACTION**
**(Against WRCOG and Renovate America)**
**(Violations of TILA)**

129.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 128 above as though they were fully set forth herein.

130.    Pursuant to TILA § 1602(g), a "creditor" is defined as a person who both (1) regularly extends consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required; and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness.

131.    In pertinent part, pursuant to Regulation Z, § 1026.2(a)(17), a person regularly extends consumer credit if it extended credit more than five times for transactions secured by a dwelling in the preceding calendar year.  Pursuant to TILA § 1602(g), a "creditor" also means any person who originates two or more high-cost mortgages in any 12-month period (as defined by TILA § 1602(bb)).

132.    TILA § 1602(bb)(1)(A) and Regulation Z § 1026.32(a)(1) define the term "high-cost mortgage" to mean any consumer credit transaction that is secured by the consumer's principal dwelling that meets one of the definitions of "high-cost mortgage."

133.    TILA § 1602(bb)(1)(A)(iii) and Regulation Z § 1026.32(a)(1)(iii) treat a consumer credit transaction as a "high-cost" mortgage if the transaction documents permit the creditor to charge prepayment fees or penalties more than 36 months after the transaction is consummated or if the prepayment penalty exceeds more than 2 percent of the amount prepaid.

134.    Regulation Z § 1026.32(b)(6) defines a prepayment penalty as a charge imposed for paying all or part of the transaction's principal before the date on which the principal is due.

135.    The Official Interpretations of Regulation Z § 1026.32(b)(6) provide that a

- 21 -

prepayment penalty includes a charge determined by treating the loan balance as outstanding for a period of time after prepayment in full and applying the interest rate to such "balance."

136.    Plaintiff's HERO Loan was secured by his principal dwelling and his Assessment Contract contained a prepayment penalty for the *entire* term of the HERO Loan because the Assessment Contract required Plaintiff to pay interest to the earlier of March 2 or September 2 occurring at least 90 days following the date of prepayment.  In fact, Plaintiff paid off his HERO Loan in May or June of 2016 and Defendants required Plaintiff to pay interest to July 5, 2016. Because the Assessment Contract permits Defendants to charge Plaintiff a prepayment penalty for the *entire* term of the HERO Loan, Plaintiff's HERO Loan is considered a "high-cost" mortgage.

137.    Additionally, each Class member's HERO Loan was secured by the Class member's principal dwelling and each Class member's Assessment Contract contains a provision that requires each Class member to pay interest after a HERO Loan is paid off for the *entire* term of the HERO Loan.  Therefore, each Class member's HERO Loan is considered a "high-cost" mortgage.

138.    Pursuant to TILA § 1602(e), "person" is defined as a natural person or an organization.

139.    Pursuant to TILA § 1602(f), "credit" is defined as the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment.

140.    Pursuant to TILA § 1602(i), the adjective "consumer" used with reference to a credit transaction, characterizes the transaction as one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes.

141.    WRCOG extended credit more than 25 times in each year relevant hereto which was payable by written agreement in more than four installments or for which a finance charge was required and is the person to whom the debt arising from the consumer credit is initially payable on the face of the evidence of indebtedness.  Moreover, WRCOG originated two or more high-cost mortgages during each year relevant hereto.  Accordingly, WRCOG is a "creditor" as defined by TILA.

- 22 -

**EXHIBIT A-2  -30-**

142.    Pursuant to TILA § 1602(cc)(5), the term "residential mortgage loan" means any consumer credit transaction that is secured by a mortgage, deed of trust, or other equivalent consensual security interest on a dwelling or on residential real property that includes a dwelling.

143.    Each Class member's HERO Loan is considered a residential mortgage loan pursuant to TILA because each Class member's HERO Loan is secured by a lien on his or her dwelling or on residential real property that includes a dwelling.

144.    At all relevant times, Defendant Renovate America was a mortgage originator as defined by TILA § 1602(cc)(2) because: (a) it was directly or indirectly compensated for taking each Class member's HERO Loan application; (b) it assisted each Class member in obtaining  or applying to obtain a HERO Loan; or (c) it offered or negotiated the terms of each Class member's HERO Loan.  Renovate America is also a mortgage originator because it represented to the public, through advertising and other means of communication, that it can and will provide those services.

145.    Renovate America is a "creditor" as defined by TILA because Renovate America is a mortgage originator, each HERO Loan is a high-cost mortgage and Renovate America originated two or more HERO Loans in each 12-month period relevant hereto.

146.    Because WRCOG and Renovate America are both considered "creditors" under TILA, pursuant to TILA § 1631(b) and Regulation Z § 1026.17(d), WRCOG and Renovate America are both liable for any TILA violations in connection with each Class member's HERO Loan.

147.    TILA § 1639c(a)(1) prohibits a creditor from making a residential mortgage loan unless the creditor makes a reasonable good faith determination based on verified and documented information that, at the time the loan is consummated, the consumer has a reasonable ability to repay the loan according to its terms.

148.    Pursuant to TILA § 1639c(a)(3), a consumer's ability to repay a residential mortgage loan must include consideration of the consumer's credit history, current income, expected income, current obligations, debt-to-income ratio, employment status, and other financial resources *other than the consumer's equity in the dwelling or real property that secures repayment of the loan*.  Pursuant to TILA § 1639c(a)(4), a creditor making a residential mortgage

- 23 -

**EXHIBIT A-2  -31-**

loan must verify amounts of income or assets that a creditor relies on to determine repayment ability, including expected income or assets, by reviewing the consumer's W-2s, tax returns, payroll receipts, financial institution records, or other third-party documents that provide reasonably reliable evidence of the consumer's income or assets.

149.    Defendants did not consider Plaintiff or any Class member's credit history, income, employment, debt-to-income ratio or financial resources in deciding whether to approve his or her HERO Loan and made such determination almost entirely on the basis of the equity in his or her property securing the HERO Loan.

150.    As a result, Defendants violated the provisions of TILA § 1639c(a)(1) because they made residential mortgage loans to Plaintiff and each Class member without making a reasonable good faith determination of his or her ability to pay.

151.    TILA § 1639c(c) prohibits a residential mortgage loan that is not a "qualified mortgage" from containing a prepayment penalty for paying all or part of the principal after the loan is consummated.

152.    The HERO Loans are **not** qualified mortgages pursuant to TILA § 1639c(c)(1)(B)(ii)(III) because the HERO Loans were consumer credit transactions secured by subordinate consensual security interests on a dwelling and the APR on the HERO Loans exceeded the average prime rate for a comparable transaction by at least 3.5 percentage points.

153.    Defendants violated the provisions of TILA § 1639c(c) because Plaintiff's and each Class member's HERO Loan contains a prepayment penalty that requires him or her to pay a penalty for paying off their HERO Loans early.

154.    TILA § 1639c(c)(3)(D) prohibits a residential mortgage loan that is a "qualified mortgage" from containing any prepayment penalty after expiration of the three-year period following when the loan is consummated.

155.    Defendants violated the provisions of TILA § 1639c(c)(3)(D) because even if the Plaintiff's and each Class member's HERO Loan is a qualified mortgage, his or her HERO Loan contains a prepayment penalty that requires him or her to pay a penalty for paying off their HERO Loan after the 3-year period when the HERO Loan is consummated.

- 24 -

156.    TILA § 1639c(e)(3) prohibits any provision of any residential mortgage loan to bar a consumer from bringing an action in any appropriate district court of the United States, or any other court of competent jurisdiction, for a violation of TILA, HOEPA or any other federal law against a creditor or a mortgage originator.  However, Plaintiff's and each Class member's HERO Loan includes a provision that purports to do so, in violation of TILA § 1639c(e)(3).

157.    As a result of Defendants' violations of TILA § 1639c(a)(1), Plaintiff and the Class members are entitled to the sum of: (i) any actual damages sustained by Plaintiff and each Class member; (ii) statutory damages in such amount as the court may allow; (iii) an amount equal to the sum of all finance charges and fees paid by Plaintiff and each Class member; and (iv) the costs of the action, together with reasonable attorneys' fees as determined by the court.

158.    As a result of Defendants' violations of TILA § 1639c(c) and (e), Plaintiff and the Class members are entitled to the sum of: (i) any actual damages sustained by Plaintiff and each Class member; (ii) statutory damages in such amount as the court may allow; and (iii) the costs of the action, together with reasonable attorneys' fees as determined by the Court.

## SECOND CAUSE OF ACTION
### (Against WRCOG and Renovate America)
### (Violations of HOEPA)

159.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 158 above as though they were fully set forth herein.

160.    As alleged above, Plaintiff's and each Class member's HERO Loan was a high-cost mortgage.

161.    HOEPA § 1639(a)(1) requires every creditor extending credit on High Cost Mortgages to provide the following disclosures, in "conspicuous" type, not less than three business days prior to closing:

-    "You are not required to complete this agreement merely because you received these disclosures or have signed a loan application."

-    "If you obtain this loan, the lender will have a mortgage on your home. You could lose your home and any money you have put into it, if you do not meet your obligations under the loan."

- 25 -

162.    Defendants did not furnish the above required disclosures to Plaintiff or any Class member at any time prior to Plaintiff and each Class member entering into a HERO Loan or at any time subsequent thereto.

163.    HOEPA § 1639(a)(2) and Regulation Z § 1026.18(e) require a creditor for fixed-rate loans to accurately disclose the "annual percentage rate," using that term.

164.    Defendants did not disclose the final APR to Plaintiff or any Class member after Defendants determined the final principal amount of their HERO Loans.

165.    HOEPA § 1639(c)(1)(A) prohibits a high-cost mortgage from containing terms under which a consumer must pay a prepayment penalty for paying all or part of the principal before the date on which the principal is due.

166.    Regulation Z § 1026.32(b)(6) defines a prepayment penalty as a charge imposed for paying all or part of the transaction's principal before the date on which the principal is due.

167.    The Official Interpretations of Regulation Z § 1026.32(b)(6) provide that a prepayment penalty includes a charge determined by treating the loan balance as outstanding for a period of time after prepayment in full and applying the interest rate to such "balance."

168.    Plaintiff's HERO Loan was secured by his principal dwelling and his HERO Assessment Contract contained a prepayment penalty for the *entire* term of the HERO Loan because the Assessment Contract required Plaintiff to pay interest to the earlier of March 2 or September 2 occurring at least 90 days following the date of prepayment.  In fact, Plaintiff paid off his HERO Loan on November 18, 2015 and Defendants required Plaintiff to pay interest from November 18, 2015 to March 2, 2016 in the approximate amount of $604.   Because the Assessment Contract permits Defendants to charge Plaintiff a prepayment penalty for the *entire* term of the HERO Loan, Plaintiff's HERO Loan is considered a "high-cost" mortgage.

169.    Additionally, each Class member's HERO Loan was secured by the Class member's principal dwelling and each Class member's Assessment Contract contains a provision that requires each Class member to pay interest following the date prepayment of the HERO Loan is made for the *entire* term of the HERO Loan.  Therefore, each Class member's HERO Loan is considered a "high-cost" mortgage.

- 26 -

**EXHIBIT A-2  -34-**

170.   HOEPA § 1639(h) prohibits a creditor from engaging in a pattern or practice of extending high-cost mortgages to borrowers based upon the borrower's collateral without regard to repayment ability, including current and expected income, current obligations, and employment.

171.   In 2013, WRCOG issued a press release stating that HERO Loan approval was not based on a consumer's household income or FICO score and was instead based on a consumer's equity in his or her property.

172.   Defendants did not consider Plaintiff's or any Class member's credit history, income, employment, debt-to-income ratio or financial resources in deciding whether to approve his or her HERO Loan and made such determination almost entirely on the basis of his or her equity in property that secured the HERO Loans.

173.   As a result, Defendants violated the provisions of HOEPA § 1639(h) because Defendants engaged in a pattern and practice of extending high-cost mortgages to HERO Loan borrowers based almost entirely on collateral without regard to repayment ability.

174.   HOEPA § 1639(i) and Regulation Z § 1026.34(a)(1) prohibit a creditor from paying a contractor under a home improvement contract from the proceeds of a high-cost mortgage other than by an instrument payable to the consumer or jointly to the consumer and the contractor; or at the election of the consumer, through a third-party escrow agent in accordance with terms established in a written agreement signed by the consumer, the creditor, and the contractor prior to the disbursement.

175.   The HERO Loans Plaintiff and each Class member entered into were home improvement loans.

176.   Defendants paid Plaintiff's contractor with an instrument made payable directly to Plaintiff's contractor.   Upon information and belief, Defendants paid each Class member's contractor with an instrument made payable to his or her contractor.

177.   Defendants violated the provisions of HOEPA § 1639(i) and Regulation Z § 1026.34(a)(1) by paying each Class member's contractor with an instrument made payable to his or her contractor.

178.   HOEPA § 1639(k) and Regulation Z § 1026.34(a)(8) prohibit a creditor from

- 27 -

imposing a late payment charge or fee in connection with a high-cost mortgage in an amount in excess of 4 percent of the amount of the payment past due and prohibit a creditor from imposing a late payment charge more than once for a single late payment. Moreover, a creditor cannot charge a late payment charge or fee in connection with a high-cost mortgage unless it is specifically permitted by the terms of the loan contract.

179. The first installment of a secured property tax bill is due on November 1 of each tax year and the payment deadline is December 10 at 5:00 p.m. A 10% penalty plus $10 cost is added to a consumer's first installment if not paid by 5:00 p.m. The second installment of a secured property tax bill is due on February 1 of each tax year and the payment deadline is April 10. A 10% penalty plus $10 cost is added to a consumer's second installment if not paid by April 10 at 5:00 p.m. In addition, on June 30 the delinquent secured property tax bills are transferred to the delinquent tax roll and additional penalties are added to a consumer's secured property tax bill at the rate of 1.5% per month (18% per year) plus a $15 redemption fee.

180. The imposition of the penalties described in the paragraph above violate HOEPA § 1639(k) and Regulation Z § 1026.34(a)(8) because Defendants can charge consumers more than 4% of any late payment and Defendants can charge monthly late payments. Additionally, the Assessment Contracts Plaintiff and each Class member entered into does not disclose the amount of any late payment penalties that Defendants may impose.

181. HOEPA § 1639(r) prohibits a creditor from taking any action in connection with a high-cost mortgage from structuring the loan transaction as an open-end credit plan or another form of loan for the purpose and with the intent of evading the provisions of HOEPA § 1639.

182. Upon information and belief, Defendants structured Plaintiff's HERO Loan and the HERO Loans of all Class members as "tax assessments" instead of home improvement mortgages with the intent of avoiding the provisions of HOEPA § 1639.

183. HOEPA § 1639(u) prohibits a creditor from extending high-cost mortgages to consumers without first receiving a certification from a counselor that is approved by the Secretary of Housing and Urban Development or a State housing finance authority that the consumer has received counseling on the advisability of the mortgage.

- 28 -

**EXHIBIT A-2  -36-**

184.    Defendants extended high-cost mortgages to Plaintiff and each Class member without Plaintiff and each Class Member receiving the counseling required by HOEPA § 1639(u).

185.    As a result of Defendants' multiple violations of HOEPA, Plaintiff and the Class members are entitled to the sum of: (i) any actual damages sustained by Plaintiff and each Class member; (ii) statutory damages in such amount as the court may allow; (iii) an amount equal to the sum of all finance charges and fees paid by Plaintiff and each Class member; and (iv) the costs of the action, together with reasonable attorneys' fees as determined by the court.

### THIRD CAUSE OF ACTION
**(Against WRCOG and Renovate America)**
**(Conspiracy to Violate TILA and HOEPA)**

186.    Plaintiff repeats and realleges the allegations set forth in Paragraph 1 through 185 above as they were fully set forth herein.

187.    At all times relevant hereto, Defendant Renovate America and Defendant WRCOG knowingly conspired and agreed with each other and acted in concert to commit the unlawful acts alleged above in the manner alleged above, all of which violated TILA and HOEPA as alleged above.

188.    At all times relevant hereto, Defendants Renovate America and WRCOG were each aware that the other planned to commit the unlawful acts alleged above in the manner alleged above, all of which violated TILA and HOEPA as alleged above.

189.    At all times relevant hereto, Defendants Renovate America and WRCOG agreed with each other to commit the unlawful acts alleged above and intended that the unlawful acts alleged above be committed.

190.    In furtherance of their conspiracy, Defendants Renovate America and WRCOG committed the unlawful acts alleged above.

191.    Among other things, pursuant to its agreement and conspiracy with Defendant WRCOG, Defendant Renovate America, acting alone or through its agents and subject to the approval or assent of WRCOG, prepared the HERO Loan documents, processed the HERO Loan applications, approved the HERO Loans, reviewed the eligibility of properties for the HERO Loan Program, administered the HERO Loans (including the calculation of interest and fees),

- 29 -

**EXHIBIT A-2  -37-**

communicated with HERO Loan applicants and HERO Loan borrowers, and prepared and issued payoff letters sent to HERO Loan borrowers. All the foregoing acts were violations of TILA or HOEPA in the manner alleged above.

192.    Among other things, pursuant to its agreement and conspiracy with Defendant Renovate America, Defendant WRCOG approved or assented to the HERO Loan documents, the HERO Loan applications, the HERO Loan approvals, the eligibility determinations of properties for the HERO Loan program, administration of the HERO Loans (including the calculation of interest and fees), communications with HERO Loan applicants and HERO Loan borrowers, and payoff letters sent to HERO Loan borrowers done by Defendant Renovate America. All the foregoing acts were violations of TILA or HOEPA in the manner alleged above.

193.    Defendants Renovate America and WRCOG shared the proceeds obtained from Plaintiff and each Class member from the unlawful acts alleged above.

194.    As a result of Defendants' conspiracy to commit the wrongful acts alleged above which constituted violations of TILA and HOEPA, Plaintiff and each Class member was damaged in the manner alleged above.

195.    Defendants Renovate America and WRCOG are, therefore, jointly and/or individually liable to Plaintiff and each Class member for the damage they suffered in the manner alleged above.

**FOURTH CAUSE OF ACTION**
**(Against WRCOG and Renovate America)**
**(Violations of TILA Mortgage Originator Rules)**

196.    Plaintiff repeats and realleges the allegations set forth in Paragraph 1 through 195 above as they were fully set forth herein.

197.    Pursuant to TILA § 1602(cc)(2), the term "mortgage originator" means any person who, for direct or indirect compensation or gain, or in the expectation of direct or indirect compensation or gain: (i) takes a residential mortgage application; (ii) assists a consumer in obtaining or applying to obtain a residential mortgage loan; or (iii) offers or negotiates terms of a residential mortgage loan. A "mortgage originator" also includes any person who represents to the public, through advertising or other means of communicating or providing information (including

- 30 -

EXHIBIT A-2  -38-

1  the use of business cards, stationary, brochures, signs, rate lists, or other promotional items), that

2  such person can or will provide any of the services or perform any of the activities described in the

3  previous sentence.

4      198.   Pursuant to TILA 1602(cc)(5), the term "residential mortgage loan" means any

5  consumer credit transaction that is secured by a mortgage, deed of trust, or other equivalent

6  consensual security interest on a dwelling or on residential real property that includes a dwelling.

7      199.   At all relevant times, Defendants were mortgage originators as defined by TILA §

8  1602(cc)(2) because: (a) they were directly or indirectly compensated for taking each Class

9  member's HERO Loan application; (b) they assisted each Class member in obtaining  or applying

10  to obtain a HERO Loan; or (c) they offered or negotiated the terms of each Class member's HERO

11  Loan.  Defendants are also mortgage originators because they represented to the public, through

12  advertising and other means of communication that they could and would provide the services

13  described in the prior sentence.

14      200.   Pursuant to TILA § 1639b(c)(3), mortgage originators are prohibited from steering

15  any consumer to a residential mortgage loan that the consumer lacks a reasonable ability to repay

16  or has predatory characteristics or effects such as equity stripping, excessive fees or abusive terms.

17      201.   When Plaintiff and each Class member entered into a HERO Loan, Defendants did

18  not consider their income when deciding whether to approve the HERO Loan.

19      202.   The HERO Loans entered into by Plaintiff and each Class member has predatory

20  characteristics that include excessive fees and abusive terms. For example, as described above: (i)

21  Defendants secretly double-counted accrued interest charged on HERO Loans; (ii) Defendants

22  secretly double-counted administrative fees charged on HERO Loans; (iii) Defendants secretly

23  charged an administrative fee on capitalized interest; (iv) Defendants did not apply payments on

24  HERO Loans when those payments were made; (v) Defendants charged interest after HERO

25  Loans were repaid in full; (vi) Defendants did not provide an accurate amortization schedule to

26  HERO Loan borrowers; (vii) Defendants made payments directly to contractors; (viii) Defendants

27  approved HERO Loans based almost solely on a borrower's collateral; and (ix) Defendants

28  unlawfully required borrowers to waive all claims against them.

- 31 -

203.    Defendants steered Plaintiff and each Class member to a HERO Loan, which has the abusive terms and practices alleged above with predatory characteristics or effects, in violation TILA § 1639b(c)(3).  Plaintiff and each Class member is, therefore, entitled to the greater of his or her actual damages or an amount equal to three times the total amount of direct and indirect compensation or gain accruing to Defendants on his or her HERO Loan, plus the costs of the action, together with reasonable attorneys' fees as determined by the Court.

## FIFTH CAUSE OF ACTION
### (Against Renovate America)
### (Violations of California's Covered Loan Law, California Financial Code § 4970, *et seq.*)

204.    Plaintiff repeats and realleges the allegations set forth in Paragraph 1 through 203 above as though they were fully set forth herein.

205.    This claim is asserted by Plaintiff on his own behalf and on behalf of the Subclass.

206.    California Financial Code § 4970(h) defines "originate" to mean arrange, negotiate, or make a consumer loan.

207.    At all times relevant hereto, Defendant Renovate America originated consumer loans because Renovate America arranged the HERO Loans.  Therefore, Renovate America is subject to the provisions of California's Covered Loan Law, California Financial Code § 4970, *et seq.*, for each HERO Loan.

208.    California Financial Code § 4970(d) defines a "consumer loan" as a consumer credit transaction that is secured by real property located in the State of California that is used as the principal dwelling of the consumer.

209.    California Financial Code § 4970(b) defines a "covered loan" to mean a consumer loan where the total points and fees exceed six percent of the total loan amount.

210.    Under the Covered Loan Law, the total loan amount of each HERO Loan is calculated by subtracting the administrative fee from the principal amount of his or her HERO Loan.

211.    Defendant Renovate America charged Plaintiff an administrative fee of 6.95%, or $1,137.02, on the total principal amount of his HERO Loan ($16,359.95 x 6.95% = $1,137.02).  However, because Renovate America secretly double-counted the disclosed administrative fee

- 32 -

**EXHIBIT A-2  -40-**

charged to Plaintiff, the actual administrative fee charged was, in fact, approximately 7.4691%.

212. For all HERO Loans in which the disclosed administrative fee was 5.70% or greater, the actual administrative fee was, in fact, greater than six percent. Therefore, Plaintiff's and each Subclass member's HERO Loan is a "covered loan" as defined by California Financial Code § 4970(b) because the total points and fees payable exceed six percent of the total loan amount.

213. California Financial Code § 4973(a)(1) prohibits a covered loan from containing a prepayment penalty after the first 36 months after the date of consummation of the loan.

214. Plaintiff's HERO Loan contained two prepayment penalties that exceed 36 months after the date of consummation of the HERO Loan. *First*, Plaintiff's HERO Loan contained a five-year prepayment penalty of a percentage of the principal amount of the HERO Loan. *Second*, Plaintiff's HERO Loan contained a prepayment penalty during the entire loan term that required him to pay interest to the earlier of March 2 or September 2 occurring at least 90 days following the date of the prepayment.

215. Every Subclass member's HERO Loan contains a prepayment penalty that lasts the entire loan term, because the HERO Loan documents require HERO Loan borrowers to pay interest that is calculated by treating the HERO Loan balance as outstanding for a period of time *after* repayment in full and then applying the interest rate to such "balance."

216. California Financial Code § 4973(f) prohibits a person who originates covered loans from making or arranging a covered loan unless at the time the loan is consummated, the person reasonably believes the borrower will be able to make the scheduled payments to repay the obligation upon consideration of his or her current and expected income, current obligations, employment status, and other financial resources, ***other than the borrower's equity in the dwelling that secures repayment of the loan***.

217. Defendant Renovate America originated a covered loan to each Subclass member without considering his or her current and expected income, current obligations, employment status, and other financial resources and based its approval of the HERO Loan almost entirely on the Subclass member's equity in the dwelling that secured the HERO Loan.

- 33 -

218.    California Financial Code § 4973(g) prohibits a person who originates a covered loan from paying a contractor under a home-improvement loan with an instrument that is payable directly to the contractor and such instrument must be payable to the consumer or jointly to the consumer and the contractor or, at the election of the consumer, to a third-party escrow agent for the benefit of the contractor in accordance with the terms and conditions established in a written escrow agreement signed by the consumer, the person who originates the covered loan, and the contractor prior to the disbursement of funds.

219.    The proceeds of Plaintiff's HERO Loan were paid directly to Plaintiff's contractor in violation of California Financial Code § 4973(g).  Upon information and belief, the proceeds of each Subclass member's HERO Loan was paid to the Subclass member's contractor in violation of California Financial Code § 4973(g).

220.    California Financial Code § 4973(k) prohibits a covered loan from being made unless the disclosure as set forth in California Financial Code § 4973(k), written in 12-point font or larger, has been provided to the consumer no later than three business days prior to signing of the loan documents of the transaction.

221.    Defendant Renovate America did not provide the disclosure required by California Financial Code § 4973(k) to Plaintiff or any Subclass member before or after Plaintiff and the other Subclass members signed their HERO Loan documents.

222.    California Financial Code § 4973(n) prohibits a person who originates a covered loan from acting in any manner, whether specifically prohibited by California Financial Code § 4973 or of a different character, that constitutes fraud.

223.    As alleged above, Renovate America: (i) secretly double-counted accrued interest charged on HERO Loans; (ii) secretly double-counted administrative fees charged on HERO Loans; (iii) secretly charged an administrative fee on capitalized interest; and (iv) secretly did not apply payments on HERO Loans when those payments were made.  These acts constitute fraud and are prohibited by California Financial Code § 4973(n).

224.    California Financial Code § 4978(a) allows a consumer to recover damages in an amount equal to any actual damages suffered by the consumer, plus attorney's fees and costs,

against any person who violates the provisions of California Financial Code § 4973.   If a consumer can demonstrate that the person's violation was willful and knowing, a consumer can recover damages in the amount of fifteen thousand dollars ($15,000) or the consumer's actual damages, whichever is greater, plus attorneys' fees and costs.

225.   California Financial Code § 4978(b)(1) states that if a provision in a contract in a covered loan violates section 4973(a), (b), (c), (d), (e), or (i), that provision is unenforceable and a court may issue an order or injunction to reform the terms of the covered loan to conform to the provisions of California Financial Code § 4978(b)(1).

226.   Moreover, California Financial Code § 4978(b)(2) allows a consumer to recover punitive damages against a person upon a finding that such damages are warranted pursuant to section 3294 of the California Civil Code.

227.   Defendant Renovate America's failure to comply with the provisions of California Financial Code § 4973 was willful and knowing.  As alleged more fully hereinabove, Renovate America imposes and collects excessive and unlawful interest and pre-payment penalties and secretly double counts administrative fees against unsuspecting homeowners.  In fact, it over charges virtually every cost, fee and amount due from HERO Loan participants to maximize its own profits.  Therefore, Renovate America's violation of California Financial Code § 4973(a), (f), (g), (k) and (n) as alleged above entitles Plaintiff and each Class member to at least $15,000 in statutory damages pursuant to California Financial Code § 4978(a) and to punitive damages pursuant to California Financial Code § 4978(b)(2) because Renovate America's conduct was malicious, oppressive and fraudulent.

228.   Additionally, Plaintiff and all other Subclass members are entitled to an injunction to reform the terms of their Assessment Contracts to prohibit Defendant Renovate America from engaging in the conduct described above.

**SIXTH CAUSE OF ACTION**
**(Against Renovate America)**
**(Violations of California Business and Professions Code §§ 17200, *et seq.*)**

229.   Plaintiff repeats and realleges the allegations set forth in Paragraph 1 through 228

- 35 -

above as though they were fully set forth herein.

230.    California Business and Professions Code §§ 17200, *et seq.* prohibits any unlawful, unfair or deceptive business act or practice.

231.    Defendant Renovate America has engaged in and continues to engage in unlawful, unfair and deceptive business practices which are substantially likely to mislead the public by: (i) secretly charging and collecting double interest, (ii) secretly charging and collecting double administrative fees, (iii) secretly failing to credit payments when made, and (iv) secretly overcharging recording fees, all in the manner alleged above.

232.    Defendant Renovate America has engaged in and continues to engage in unlawful, unfair, or deceptive business practices which are substantially likely to mislead the public by committing the acts in violation of TILA alleged above.

233.    Defendant Renovate America has engaged in and continues to engage in unlawful, unfair, or deceptive business practices which are substantially likely to mislead the public by committing the acts in violation of HOEPA alleged above.

234.    Defendant Renovate America has engaged in and continues to engage in unlawful, unfair, or deceptive business practices which are substantially likely to mislead the public by committing the acts in violation of the Covered Loan Law alleged above.

235.    Defendant Renovate America's conduct resulted in profits and pecuniary gain received from homeowners – *i.e.*, Plaintiff and the other Class members – who entered into HERO Loans.

236.    Plaintiff relied upon Defendant Renovate America's unlawful, unfair, and deceptive acts alleged above when applying for and entering into his HERO Loan, when paying installments due under his HERO Loan, and when paying off his HERO Loan, and was damaged thereby.  Had Plaintiff known the truth about the fees, costs, and terms of his HERO Loan, he would not have entered into a HERO Loan or would have done so only for lower fees and costs and on different terms.

237.    Defendant Renovate America's business practices alleged above are unlawful, unfair, and deceptive within the meaning of California Business and Professions Code §§ 17200,

- 36 -

*et seq.* because, *inter alia*, Defendant Renovate America engaged in acts that deceived, or were likely to deceive, the public.

238.    In addition to the foregoing, Defendant Renovate America failed to provide the following material disclosures required by TILA: the annual percentage rate; the method of determining the finance charge; the balance upon which a finance charge will be imposed; the amount of the finance charge; and the amount financed.

Defendant Renovate America also failed to: disclose the "amount financed," using that term, as required by TILA § 1638(a)(2)(A) and (B); disclose the "finance charge," not itemized, using that term, as required by TILA § 1638(a)(3); disclose the finance charge expressed as an "annual percentage rate," using that term, as required by TILA § 1638(a)(4); disclose the sum of the amount financed and the finance charge, using the term "total of payments" as required by TILA § 1638(a)(5); provide descriptive explanations of the terms "amount financed," "finance charge," "annual percentage rate," and "total of payments" as required by TILA § 1638(a)(8); provide a statement that a security interest has been taken in Plaintiff's and each Class member's dwelling as required by TILA § 1638(a)(9); disclose any dollar charge or percentage amount which may be imposed by Renovate America solely on account of a late payment as required by TILA § 1638(a)(10); provide HERO borrowers with a statement that they should refer to the contract documents for any information such documents provide about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment penalties as required by TILA § 1638(a)(17); disclose the aggregate amount of fees paid to the mortgage originator in connection with the loan, the amount of such fees paid directly by the consumer, and any additional amount received by the originator from the creditor as required by TILA § 1638(a)(18); disclose the total amount of interest that HERO Loan borrowers will pay over the life of their HERO Loans as a percentage of the principal of the HERO Loan as required by TILA § 1638(a)(19); and to give HERO Loan borrowers in conspicuous type size and format the statement required by TILA § 1638(b)(2)(B).

239.    As a direct and proximate result of Defendant Renovate America's conduct alleged herein, Renovate America has received ill-gotten gains or profits, including, but not limited to money.  Therefore, Defendant Renovate America was and is unjustly enriched.

- 37 -

CLASS ACTION COMPLAINT

**EXHIBIT A-2  -45-**

240.    Pursuant to California Business and Professions Code § 17203, Plaintiff and the Class requests restitution or disgorgement of all ill-gotten gains, including profits, obtained in violation of California Business and Professions Code §§ 17200, *et seq.*

241.    Plaintiff and the Class seek to enjoin Defendant Renovate America from engaging in these wrongful practices, as alleged herein, in the future.  There is no other adequate remedy at law and if an injunction is not ordered, Plaintiff and the Class will suffer irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, pray for relief and judgment against Defendants as follows:

a.    certifying the Class and Subclass as requested herein, appointing Plaintiff as a class representative for the Class and Subclass and appointing Wolf Haldenstein Adler Freeman & Herz LLP as Lead Counsel for the Class and Subclass;

b.    actual damages in an amount to be determined at trial;

c.    statutory and additional damages as described in each count hereinabove;

d.    requiring Defendants to disgorge or return all monies, revenues and profits obtained by means of any wrongful act;

e.    injunctive relief;

f.    punitive damages as applicable;

g.    an award of reasonable attorneys' fees and costs; and

h.    such other relief at law or equity as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED:  October 31, 2016          **WOLF HALDENSTEIN ADLER**
                                  **FREEMAN & HERZ LLP**

                                  By: *Rachele R. Rickert*
                                  RACHELE R. RICKERT

                                  BETSY C. MANIFOLD
                                  manifold@whafh.com

- 38 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RACHELE R. RICKERT
rickert@whafh.com
750 B Street, Suite 2770
San Diego, CA 92101
Telephone:   619/239-4599;
Facsimile:   619/234-4599

**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
MARK C. RIFKIN
rifkin@whafh.com
JANINE POLLACK
pollack@whafh.com
RANDALL S. NEWMAN
newman@whafh.com
270 Madison Avenue
New York, New York 10016
Telephone:  212/545-4600
Facsimile:  212/545-4653

**MCLAUGHLIN & STERN LLP**
LEE SHALOV
lshalov@mclaughlinstern.com
260 Madison Avenue
New York, New York 10016
Telephone:  646/278-4298
Facsimile:  212/448-0066

*Attorneys for Plaintiff George Loya*

HERO: 23438

- 39 -

CLASS ACTION COMPLAINT

**EXHIBIT A-2  -47-**

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Betsy C. Manifold (152450); Rachele R. Rickert (190634)<br>WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP<br>750 B Street, Suite 2770, San Diego, CA 92101<br>TELEPHONE NO.: 619/239-4599    FAX NO.: 619/234-4599<br>ATTORNEY FOR (Name): Plaintiff George Loya | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  Riverside
STREET ADDRESS: 4050 Main Street
MAILING ADDRESS:
CITY AND ZIP CODE: Riverside, CA 92501
BRANCH NAME: Riverside Historic Courthouse

CASE NAME:
George Loya v. Western Riverside Council of Governments, et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| [✓] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | RIC 1614434 |
| | | | JUDGE: | |
| | | | DEPT: | BY FAX |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[✓] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [✓] is  [ ] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties    d. [✓] Large number of witnesses
   b. [✓] Extensive motion practice raising difficult or novel    e. [ ] Coordination with related actions pending in one or more courts
       issues that will be time-consuming to resolve        in other counties, states, or countries, or in a federal court
   c. [✓] Substantial amount of documentary evidence    f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [✓] monetary  b. [✓] nonmonetary; declaratory or injunctive relief  c. [✓] punitive
4. Number of causes of action (specify): 6: Violations of 15 U.S.C. §§ 1601, 1639; Cal. Fin. Code § 4970; Cal. Bus. & Prof. Code § 17200, conspiracy
5. This case [✓] is  [ ] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: October 31, 2016
Rachele R. Rickert                                    _Rachele R Rickert_
_____(TYPE OR PRINT NAME)_____                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

**EXHIBIT A-2  -48-**

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
  Damage/Wrongful Death
Uninsured Motorist (46) *(if the
  case involves an uninsured
  motorist claim subject to
  arbitration, check this item
  instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
    Wrongful Death
Product Liability *(not asbestos or
  toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice–
    Physicians & Surgeons
  Other Professional Health Care
    Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip
    and fall)
  Intentional Bodily Injury/PD/WD
    (e.g., assault, vandalism)
  Intentional Infliction of
    Emotional Distress
  Negligent Infliction of
    Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
  Practice (07)
Civil Rights (e.g., discrimination,
  false arrest) *(not civil
  harassment)* (08)
Defamation (e.g., slander, libel)
  (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
    *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease
    Contract *(not unlawful detainer
      or wrongful eviction)*
  Contract/Warranty Breach–Seller
    Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/
    Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections
    Case
Insurance Coverage *(not provisionally
  complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
  Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent
    domain, landlord/tenant, or
    foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
  drugs, check this item; otherwise,
  report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
    Case Matter
  Writ–Other Limited Court Case
    Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor
    Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
  *(arising from provisionally complex
  case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of
    County)
  Confession of Judgment *(non-
    domestic relations)*
  Sister State Judgment
  Administrative Agency Award
    *(not unpaid taxes)*
  Petition/Certification of Entry of
    Judgment on Unpaid Taxes
  Other Enforcement of Judgment
    Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
  above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-
    harassment)*
  Mechanics Lien
  Other Commercial Complaint
    Case *(non-tort/non-complex)*
  Other Civil Complaint
    *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
  Governance (21)
Other Petition *(not specified
  above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult
    Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late
    Claim
  Other Civil Petition

CM-010 [Rev. July 1, 2007]          **CIVIL CASE COVER SHEET**          Page 2 of 2

**EXHIBIT A-2  -49-**